IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| WESTFIELD INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:24-cv-02478-SHL-cgc |
| | ) |
| LEGACY CONSTRUCTION SERVICES, | ) |
| LP F/K/A LEGACY CONSTRUCTION | ) |
| SERVICES, JOHN B. HERIN, JR., TINA | ) |
| HERIN, FRANK T. BARTOZZI, and | ) |
| JUDY BARTOZZI, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is Plaintiff Westfield Insurance Company's ("Westfield") Motion for Preliminary Injunction, filed August 23, 2024. (ECF No. 23.) Defendants Frank T. Bartozzi and Judy F. Bartozzi responded on September 6, 2024. (ECF No. 28.) With leave of Court, Westfield filed a reply on September 19, 2024. (ECF No. 32.) For the reasons stated below, the motion is **GRANTED**.

**BACKGROUND**

**I.    The Indemnity Agreement**

This case involves the ongoing construction of a fire station in Southaven, Mississippi, involving Legacy Construction ("Legacy"), a Tennessee-based limited partnership. Legacy furnishes surety bonds in connection with some of its construction projects. (ECF No. 1 at PageID 3.) Westfield would sometimes issue surety bonds on Legacy's behalf and, as a condition of doing so, in September 2016 entered into an indemnity agreement (the "Indemnity

Agreement") with Defendants John B. Herin, Jr., Tina Herin, Frank T. Bartozzi, and Judy F. Bartozzi (the "Indemnitors"). (See ECF No. 1-7.)[1]

The Indemnity Agreement's terms place obligations on Indemnitors and give Westfield broad discretion to enforce those obligations. For instance, Paragraph 2(a) provides that "Indemnitors shall exonerate and indemnify the Surety from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain." (ECF No. 1-7 at PageID 36.)

Under Paragraph 2(b), "[w]henever liability exists or is asserted against [Westfield], whether or not [Westfield] shall have made any payment therefor, or if deemed necessary by [Westfield] in [Westfield's] sole discretion, [Westfield] may demand, and the Indemnitors shall deposit with [Westfield], cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to [Westfield] in its sole discretion." (Id.) In the same paragraph, "[t]he Indemnitors acknowledge that the failure of the Indemnitors to deposit with [Westfield], immediately upon demand, the sum demanded by [Westfield] as collateral shall cause irreparable harm to [Westfield] for which [Westfield] has no adequate remedy at law." (Id.)

Paragraph 2(c) of the Indemnity Agreement provides that "[t]he Indemnitors agree that [Westfield] shall be entitled to injunctive relief for specific performance of any or all of the

---

[1] Frank Bartozzi was previously a general partner in Legacy Construction Services, LP, before transitioning to the role of limited partner in January 2020. (ECF No. 29 at PageID 254.) He has not played an active role in Legacy's business operations since 2020. (Id.) Judy Bartozzi has never been a general or limited partner of Legacy and has never played an active role in Legacy's business operations. (Id.) The Bartozzis assert that they signed the Indemnity Agreement "[i]n an effort to assist their son-in-law, John Herin, Jr. ('Bracey Herin'), who is married to the Bartozzis' daughter, Tina Herin, with his business." (Id.)

obligations of the Indemnitors under this Agreement including the obligation to pay to [Westfield] the sum demanded and hereby waive any claims or defenses to the contrary." (Id.)

Finally, the Indemnity Agreement provides that it may not be modified except in writing signed by all parties and that,

> **THE INDEMNITORS HEREBY ACKNOWLEDGE THAT THIS AGREEMENT IS INTENDED TO COVER WHATEVER BONDS (WHETHER OR NOT COVERED BY ANY OTHER AGREEMENT OF INDEMNITY SIGNED AT ANY TIME BY ANY ONE OR MORE OF THE INDEMNITORS, ALL OTHER AGREEMENTS OF INDEMNITY OF ANY KIND BEING SUPPLEMENTAL TO THIS), MAY BE EXECUTED BY THE SURETY ON BEHALF OF THE INDEMNITORS, OR ANY ONE OF THEM (WHETHER CONTRACTING ALONE OR AS A JOINT OR CO-VENTURER), FROM TIME TO TIME, AND OVER AN INDEFINITE PERIOD OF YEARS, UNTIL THIS AGREEMENT SHALL BE CANCELLED IN ACCORDANCE WITH THE TERMS HEREOF.**

(Id. at PageID 42.)

## II.     The Fire Station Project and the Bonds

In March 2021, Legacy entered into a $3,871,938 contract (the "Contract") with the City of Southaven ("Southaven"), Mississippi, through which Legacy was to work as the general contractor to build a fire station. (ECF No. 1 at PageID 9.) Westfield issued Performance Bond 124330V and Payment Bond 124330V at the request of at least one of the Indemnitors. (Id.) After disputes arose between Legacy, Southaven, and the project's architect, Southaven declared a contractor default pursuant to the Performance Bond, terminating Legacy's right to complete the Contract under its terms. (Id. at PageID 10.)

Southaven agreed to pay Westfield the balance of the contract price, as contemplated under the Performance Bond, and demanded Westfield make a performance election under the terms of the Performance Bond. (Id.) Westfield, at the request of at least one of the Indemnitors, agreed to undertake the obligation to perform and complete the contract using Legacy. (Id.)

3

Westfield and the Indemnitors then negotiated and executed a completion agreement (the "Completion Agreement"), which governed the terms of the project's completion and, among other things, acknowledged the Indemnitors' execution of the Indemnity Agreement and "reaffirm[ed] their continuing joint and several obligations and liabilities to the Surety thereunder." (Id. at PageID 12; see also ECF No. 1-9.) All of the Indemnitors signed the Completion Agreement. (ECF No. 1-9 at PageID 60.)

The Completion Agreement also provided that Westfield had the "right to exercise its rights to take possession of, complete, or arrange for the completion of the Construction Contract or [Westfield]'s right to demand the deposit of additional collateral if deemed necessary in [Westfield]'s sole discretion." (Id. at PageID 13.) As part of the Completion Agreement, Defendant Indemnitors John and Tina Herin agreed to pledge a security interest in and a lien on the property at 214 Mountain Brook Cove, Eads, Tennessee. (ECF No. 1-9 at PageID 58.) The Completion Agreement further provided that Westfield's rights were "in addition to [its] rights under the Indemnity Agreement including, but not limited to, [its] right to exercise its rights to take possession of, complete, or arrange for the completion of the Construction Contract or [its] right to demand the deposit of additional collateral if deemed necessary in [its] sole discretion." (Id. at PageID 59.)

After the execution of the Completion Agreement, Westfield negotiated a takeover agreement (the "Takeover Agreement") with Southaven, which, among other things, affirmed the Indemnitors' obligations to Westfield and set forth the terms under which Westfield was willing to use Legacy to perform and complete the Contract. (ECF No. 1 at PageID 14.)

Southaven eventually alleged that Westfield breached the Takeover Agreement and/or breached the duty of good faith and fair dealing based on Legacy's poor performance on the

4

project.  (Id.)  Southaven asserted that it incurred architectural, consultant, and attorneys' fees, as well as liquidated and other delay damages, and asserted that it could set off those fees from monies it owed to Westfield or otherwise recover them from Westfield.  (Id. at PageID 14–15.)  Westfield asserts that, as a result of Legacy Construction's struggles and financial instability, it was forced to use its own funds to pay Legacy's subcontractors and suppliers for labor, materials, and equipment they had furnished or may furnish in relation to the Contract.  (Id. at PageID 16.)

Given these and other potential obligations Westfield faced, it sent a letter on May 24, 2024, to the Indemnitors demanding that they make a "deposit of cash or an irrevocable letter of credit in the amount of $2,000,000 within 10 days of that letter as collateral security for their obligations to Westfield" and "grant Westfield free access to their books, records, accounts, etc." (Id. at PageID 16.)  To date, Indemnitors have done neither, prompting Westfield to file its three-count complaint.  Count I seeks specific performance in the form of deposit of collateral.  (Id. at PageID 17–19.)  Count II seeks specific performance in the form of access to the books, records, and accounts of the Indemnitors and Legacy.  (Id. at PageID 19–21.)  Count III is a claim for breach of contract, i.e., the Indemnity Agreement.  (Id. at PageID 21–22.)

This Motion relates to Counts I and II and "seeks specific performance of the collateral security provision and the books and records provision of the [Indemnity Agreement]."  (ECF No. 23 at PageID 155.)  For their part, the Bartozzis assert that they "bear no fault and have been sued for money damages and injunctive relief solely because they signed an Indemnity Agreement many years ago at a time when they had no expectation that Legacy might be accused of failing to finish a multi-million dollar construction project in a timely and workmanlike manner."  (ECF No. 29 at PageID 261.)  The Bartozzis also point to the security interest that

5

John Herin granted Westfield in his home, and assert that, while "they do not know the actual value of the home, a simple search of real estate websites reveals that the home has substantial value."[2] (Id. at PageID 258.) Ultimately, the Bartozzis assert that they "were never called upon by the plaintiff to sign annual statements related to the Indemnity Agreement or any existing or issued bonds, that [they] were not involved in the arrangement under which Legacy would continue working on the Project under the Completion Agreement, that [they] bear no fault whatsoever for whatever deficiencies there may be on the Project, and/or that Legacy (and by default [they]) have asserted that the alleged deficiencies on the Project were the result of acts or omissions of the Owner, the Architect, and/or the plaintiff." (ECF No. 29 at PageID 258–59.)

## ANALYSIS

### I.  Legal Standard

There are four factors courts must balance when determining whether a plaintiff is entitled to a preliminary injunction: "(1) whether the movant has shown a strong likelihood of success on the merits; (2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued; (3) whether the issuance of a preliminary injunction will cause substantial harm to third parties; and (4) whether the public interest would be served by the issuance of a preliminary injunction. G.S. by & through Schwaigert v. Lee, 560 F. Supp. 3d 1113, 1121 (W.D. Tenn. 2021) (citing Sandison v. Mich. High Sch. Athletic Ass'n, 64 F.3d

---

[2] The Indemnity Agreement makes it clear that the Indemnitors are jointly and severally liable for depositing collateral, which the Completion Agreement reaffirms. (See ECF No. 1-7 at PageID 36; ECF No. 1-9 at PageID 55.) The Completion Agreement also required the Herins, as a "Partial Satisfaction of the Indemnitors' Collateral Obligations to the Surety," to "pledge or to cause to be pledged to the Surety a security interest in and a lien on certain real property generally described as 214 Mountain Brook Cove, Eads, Tennessee 38028 (collectively with all improvements, fixtures, leases, rents, income, etc." (ECF No. 1-9 at PageID 58.) The Parties do not dispute that the Herins fulfilled this requirement. The Herins did not respond to the Motion for Preliminary Injunction.

1026, 1030 (6th Cir. 1995)). Each factor need not be explicitly considered if one is dispositive. Robinson v. Tansley, No. 2:23-cv-02589-SHL-atc, 2023 WL 6613099, at *2 (W.D. Tenn. Oct. 10, 2023) (quoting Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007). "The likelihood of success on the merits is generally the most important factor of a preliminary injunction analysis." Higuchi Int'l Corp. v. Autoliv ASP, Inc., No. 23-1752, 2024 WL 2381879, at *6 (6th Cir. May 23, 2024) (citing Sunless, Inc. v. Palm Beach Tan, Inc., 33 F.4th 866, 871 (6th Cir. 2022)). Each of the factors is addressed below.

A. Likelihood of Success

Westfield asserts that it is likely to succeed on the merits of its claim for specific performance because it "lacks an adequate remedy at law in relation to the Indemnitors' breach of those duties," which satisfies the first prong of the test under Sixth Circuit law and which Defendants explicitly acknowledged under Paragraph 2(b) of the Indemnity Agreement. (ECF No. 23-1 at PageID 159.)

Federal courts interpreting Tennessee law[3] have determined that indemnity agreements, like other contracts, are enforced according to their plain and unambiguous terms. Great Am. Ins. Co. v. SRS, Inc., No. 3:11-CV-00970, 2011 WL 6754072, at *6 (M.D. Tenn. Dec. 23, 2011) (citing Hardeman v. Cnty. Bank v. Stallings, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995)). And, "[a]s with any other contract, 'the clear language must be interpreted and enforced as written

---

[3] Although the Completion Agreement provides that it "shall be interpreted and enforced in accordance with the laws of the State of Tennessee," the Indemnity Agreement is silent on the choice of law. Nevertheless, the Parties do not dispute that Tennessee law applies here and, in any event, where, as here, "[a] federal court [is] sitting in diversity[, it] applies the substantive law of the state in which it sits." Lukowski v. CSX Transp., Inc., 416 F.3d 478, 484 (6th Cir. 2005) (quoting Hayes v. Equitable Energy Res. Co., 266 F.3d 560, 566 (6th Cir. 2001)).

even though it contains terms which may be considered harsh and unjust by a court.'" Id. (quoting Memphis Hous. Auth. v. Thompson, 38 S.W.3d 504, 511 (Tenn. 2001)). Indemnity agreements are nevertheless "subject to the traditional implied obligations of good faith and fair dealing, including the requirement that, 'in performance of its duty to indemnify the insured, the insurer is bound to exercise "good faith" and to act fairly in the interest of the insured.'" Id. (quoting Old Republic Sur. Co. v. Eshaghpour, No. M1999-01918-COA-R3CV, 2001 WL 1523364, at *2 (Tenn. Ct. App. Nov. 30, 2001)).

The circumstances here are similar to those the court confronted in SRS, where "the contract obligate[d] the Indemnitors to indemnify and hold harmless" the surety "against actual and potential liability," "specifically provide[d] that [the surety was] entitled to specific performance and that the Indemnitors waived any claims or defenses to the contrary," and that the surety "lacks an adequate remedy at law relative to the Indemnitors' failure to deposit collateral security." Id. at *7. Ultimately, the court determined that "it must enforce these provisions." Id. So, too, here.

Paragraph 2 of this Indemnity Agreement captures almost precisely the same terms that were at issue in SRS. The Indemnity Agreement provides that the Indemnitors, including the Bartozzis, "shall exonerate and indemnify the Surety from and against any and all liability for losses and/or expenses of whatsoever kind (including, but not limited to, interest, court costs, and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain," allows for specific performance on Westfield's demand, and includes an acknowledgement that a failure to make such a deposit would cause Westfield irreparable harm

8

for which it has no adequate remedy at law,[4] and an agreement that Westfield would be entitled to injunctive relief for specific performance. (ECF NO. 1-7 at PageID 36–37.)

The court in SRS also confronted—and rejected—a similar argument that the Bartozzis make here, namely that "a Court should not award relief in the form of a preliminary injunction that should only be recovered after a trial on the merits." (ECF No. 29 at PageID 258 (citing Dunn v. Retail Clerks Intern. Ass'n, 299 F.2d 873, 874 (6th Cir. 1962).) The court in SRS correctly determined that Dunn was inapposite, noted courts routinely granted preliminary injunctions under analogous circumstances, and explained that "a preliminary injunction often effectively resolves the essence of a case." 2011 WL 6754072, at *6 (citation omitted).

Contrary to the Bartozzis' claims, Westfield's efforts to secure that which it is entitled to under the Indemnity Agreement does not constitute bad faith under Tennessee law. See Town & Country Equip., Inc. v. Deere & Co., Inc., 133 F. Supp. 2d 665, 668–69 (W.D. Tenn. 2000) ("there was no breach of the duty of good faith and fair dealing when a party performed as it was 'specifically allowed' by the contract" (citing Bank of Crockett v. Cullipher, 752 S.W.2d 84, 91–92 (Tenn. Ct. App. 1988)). Moreover, as Westfield points out, courts routinely require collateral to be deposited when defendants are otherwise obligated to do so under an agreement but make an assertion that the demand is being made in bad faith. (See ECF No. 32 at PageID 282 n.2 (collecting cases).)

The court in SRS also dispelled with arguments that the defendants in that case acted in bad faith based on, among other things, that seeking relief from the indemnitors would

---

[4] The Bartozzis offer no rebuttal to the more than a dozen cases Westfield cites from other jurisdictions that stand for the proposition that sureties lack an adequate remedy at law related to the breach of collateral security provisions, rendering the sort of specific performance Westfield seeks here as the proper remedy. (See ECF No. 23-1 at PageID 170 n.6.)

9

potentially bankrupt them.  The court explained that "the Indemnitors have cited to no legal authority that financial hardship provides a defense to a surety's claim and, in any case, the Indemnitors contractually waived their defenses to specific performance by [the surety]."  Id. at *7.

The Bartozzis' bad faith arguments are based on their assertions that Westfield continues to pursue funds from them "while knowing that the Bartozzis are retirees, that the Bartozzis had no active role in Legacy since 2020 (on the Project or otherwise), and that the Bartozzis only signed the Indemnity Agreement to help their son-in-law."  (ECF No. 29 at PageID 258.)  At bottom, the Bartozzis do not dispute having signed the Indemnity Agreement and the Completion Agreement, which reaffirmed their obligations to Westfield under the Indemnity Agreement, and added additional obligations, which renders their status as retirees, their role in Legacy, and their motivation for signing the Indemnity Agreement irrelevant.

For the foregoing reasons, Westfield is likely to succeed on the merits of its claim for specific performance of depositing collateral and allowing access to Defendants' books and records.  Although the likelihood of success is the most important factor in the preliminary injunction analysis, the Court will analyze the remaining three factors.

B. <u>Irreparable Harm</u>

Absent injunctive relief, Westfield asserts that it would continue to be deprived of its bargained-for rights to, first, "receive, hold, and/or utilize the collateral to avoid liability and/or to secure the Indemnitors' obligations" and, second, to "receive access to information that is critical to Westfield's mitigation of its liability and enforcement of its rights against the Indemnitors."  (ECF No. 23-1 at PageID 159.)  It asserts that this is especially true because the Bartozzis appear to be fraudulently transferring assets to trusts.  (Id. at PageID 176.)

The Bartozzis assert that, "[w]hen money damages are available, an injury is not irremediable, and injunctive relief is simply not appropriate." (ECF No. 29 at PageID 259 (citing Tiger Lily LLC v. United States Dept. of Housing & Urban Dev., 499 F. Supp. 3d 538, 549 (W.D. Tenn. 2020)). Moreover, they assert that the damages Westfield may incur are "inconsistent, unsubstantiated, ballpark estimates of exposure" provided by Westfield itself and that it "has adequate or at least substantial assets available to remedy whatever damages it might potentially sustain in the form of the security interest in the home of Bracey and Tina Herin." (Id.)[5]

It is generally true that "the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Dixit v. Smith, No. 2:21-cv-02602-JTF-atc, 2023 WL 3562974, at *3 (W.D. Tenn. May 19, 2023), appeal dismissed, No. 23-5595, 2023 WL 9055473 (6th Cir. Oct. 25, 2023) (quoting Ohio v. Becerra, No. 21-4235, 2022 WL 413680, at *2 (6th Cir. Feb. 8, 2022)). Nevertheless, in circumstances such as these, "[c]ourts have found that sureties suffer immediate, irreparable harm if they are denied their bargained-for right to collateral." Westfield Ins. Co. v. Rainey Contracting, LLC, 179 F. Supp. 3d 798, 801 (E.D. Tenn. 2016) (collecting cases). So, under these circumstances, "courts have routinely found that sureties suffer immediate, irreparable harm if they are denied receipt of collateral after liability has been asserted against them." SRS, 2011 WL 6754072, at *8.

---

[5] As noted above, the terms of the Indemnity Agreement afford Westfield the ability to demand "cash or other collateral to secure the obligations of this Agreement, in kind and amount satisfactory to the Surety in its sole discretion." (ECF No. 1-7 at PageID 36.) Beyond this, Westfield asserts that, to the extent that the Deed of Trust executed by the Herins "was sufficient collateral at the time the Completion Agreement was executed . . . now that Westfield has been forced to use its own funds and remains exposed to additional liability in excess of $2,000,000.00, Westfield is entitled to additional 'cash or other collateral' totaling $2,000,000.00 to prevent additional loss under the Performance Bond." (ECF No. 32 at PageID 286.)

11

Ultimately, just as was the case in Rainey, to find a money judgment at the conclusion of litigation to be sufficient in these circumstances, as the Bartozzis argue, would be to "ignore[] the clear provision of the contract as well as the holdings by other courts . . . that sureties suffer immediate, irreparable harm when denied their bargained for collateralization of anticipated liability." Rainey, 179 F. Supp. 3d at 801. Even more, there is a level of uncertainty and exposure confronting Westfield in this case that was not present in Rainey. In that case, Westfield issued two performance and payment bonds on behalf of the defendant for two construction projects. Id. at 800. Unlike in this case, where the fire station project is ongoing, both projects at issue in Rainey were already complete when Westfield filed suit. The Court rejected the defendants' argument there that "any actual loss suffered by Westfield is fully compensable by money damages, which are not difficult to calculate since both projects are completed," because the "defendants bargained for and agreed to collateralize Westfield against anticipated liability on the front-end in addition to reimbursement for actual losses on the back-end." Id. at 801. Here, Westfield's ongoing, potentially increasing exposure and uncertain liability make that conclusion even more applicable in these circumstances, and reveals the irreparable harm Westfield faces.

The same analysis that applies to the collateral Westfield seeks is equally applicable to the records it is seeking. The Bartozzis assert that Westfield "has failed to show why it needs immediate access to that information," and that Westfield "could obtain this information in the normal course of discovery." (ECF No. 29 at PageID 259–60.) But the fact is that, by the time Westfield receives discovery responses, it may already have been irreparably harmed, if it has not been already.

As noted in the Motion, the Bartozzis executed a Quitclaim Deed on June 19, 2024, in which they "purported to quitclaim, convey, and/or relinquish their interest in certain real property located at 2870 Belgrave Drive, Germantown, Tennessee 38138 to a trust described as 'Bartozzi Tennessee Investment Services.'" (ECF No. 23-1 at PageID 166; see also id. at PageID 181–83.)  In other words, the Bartozzis have taken demonstrable steps that may impede Westfield from enjoying the benefit of what it bargained for under the Indemnity Agreement.

Westfield's ability to examine the records relating to that and other transactions constitutes the same sort of irreparable harm the court found under similar circumstances in Selective Ins. Co. of Am. v. KCS Constr., LLC, No. 1:18-CV-00002, 2018 WL 2183840 (M.D. Tenn. May 10, 2018).  In that case, the court rejected the arguments of a similarly positioned indemnitor that financial records could be provided during the normal course of discovery without the risk of irreparable harm.  Id. at *4.  There, the indemnitors were selling a property that they previously offered as collateral.  Id.  The court concluded that the surety "will suffer irreparable harm without immediately having access to the Indemnitors' financial records, as defined in the Indemnity Agreement."  Id.  Although the Bartozzis do not appear to have sold assets that might satisfy their obligations under the Indemnity Agreement, the record demonstrates, and they do not dispute, that they have taken similar steps to the indemnitors in Selective, which justifies the immediate enforcement of the records provision within the Indemnity Agreement.

Given the foregoing, Westfield has demonstrated that, absent the Bartozzis depositing collateral and allowing Westfield to access their books, they will face irreparable harm.  This factor also weighs in its favor.

13

C. <u>Balance of the Equities</u>

Westfield asserts that, "[w]hen weighing the real and irreparable injury Westfield would continue to suffer absent the entry of a preliminary injunction and the potential harm the entry of an injunction could theoretically cause the Indemnitors, the balance of the equities undoubtedly weighs in Westfield's favor." (ECF No. 23-1 at PageID 176.) The Bartozzis counter that they are "retirees who played no part whatsoever in any aspect of the Project," and "are simply in the unfortunate position of having signed an Indemnity Agreement with unconscionable (and potentially unenforceable) terms nearly eight years ago in an effort to help their son-in-law." (ECF No. 29 at PageID 260.) Ultimately, they suggest that to force them to abide by the terms of the Indemnity Agreement "would put them at risk of financial ruin at a time when they are no longer capable of earning adequate income to pay their bills." (<u>Id.</u>)

Although the Court is sympathetic to the Bartozzis' plight, as was the case with the indemnitors in <u>SRS</u>, the Bartozzis "cite to no legal authority that financial hardship is a defense or that it should tip the equities in [their] favor." 2011 WL 6754072, at *9. The Bartozzis are essentially asserting that they should be able to shift the exposure to potential financial harm from themselves to Westfield, even though that conflicts with the plain terms of the Indemnity Agreement they signed. Here, Westfield is "simply seeking to enforce its right to collateral security under the Indemnity Agreement, which courts have routinely found satisfies the equities balancing test, even where enforcement causes financial hardship to the principal." <u>Id.</u> (collecting cases that stand for the proposition that equities favor the sureties in such situations where the indemnitors are required to perform as they contractually agreed to do).

This balance of equities, like the first two factors, also weighs in Westfield's favor.

14

D. <u>Whether the Public Interest Will be Served</u>

As to the fourth prong, Westfield asserts that the public interest would be served by the issuance of a preliminary injunction for multiple reasons, including the interest of enforcing clear and unambiguous indemnity agreements as well as instilling confidence within the surety industry. (ECF No. 23-1 at PageID 177.) The Bartozzis assert that "[p]ublic policy does not favor forcing retirees who played no active role in causing or contributing to alleged damages to pay for the alleged fault of others." (ECF No. 29 at PageID 260–61.) They further assert that, in circumstances such as these, where the reach of an injunction is limited only to the parties, "the public interest will be at most a neutral factor in the analysis." (<u>Id.</u> at PageID 260 (quoting <u>Travelers Cas. & Sur. Co. of Am. v. Williams Bro., Inc.</u>, No. 2:12cv58-LDG-NJK, 2013 WL 553791, *12 (D. Nev. Oct. 4, 2013)).

This factor also weighs in Westfield's favor, most fundamentally because "[t]here is a public interest in enforcing the terms of a valid contract." <u>Selective</u>, 2018 WL 2183840, at *4 (citation omitted); <u>see</u> <u>also</u> <u>Stryker Emp. Co., LLC v. Abbas</u>, 60 F.4th 372, 386 (6th Cir. 2023) ("The district court correctly observed that the public interest lies in enforcing contracts.")[6] That is certainly true when the valid contract involves upholding the rights of sureties, as "enforcing surety agreements serves an important public interest by ensuring the solvency of surety companies and supporting the ability of surety companies to provide necessary bonding for public works projects." <u>SRS</u>, 2011 WL 6754072, at *10 (M.D. Tenn. Dec. 23, 2011) (citing <u>Int'l Fid. Ins. Co. v. Anchor Envt'l, Inc.</u>, Civil Action No. 07–04750, 2008 WL 1931004, at *7 (E.D.

---

[6] As noted above, the Bartozzis suggest that the Indemnity Agreement "might be unconscionable (and potentially unenforceable)." (ECF No. 29 at PageID 260.) They do not elaborate on these points, however, and do not otherwise challenge the validity of the Indemnity Agreement.

15

Pa. May 1, 2008), and Developers Sur. & Indem. Co. v. Elec. Serv. & Repair, Inc., No. 09–21678–CIV, 2009 WL 3831437, at *2 (S.D. Fla. Nov.16, 2009) for the proposition that issuing a preliminary injunction in favor of a surety vindicated public interests).  This final factor also weighs in favor of issuing a preliminary injunction.

## CONCLUSION

For the foregoing reasons, Westfield's Motion for Preliminary Injunction is **GRANTED**.[7] Westfield is entitled to the specific performance of the collateral security provision in the Indemnity Agreement, as well as access to the books and records as described therein. Therefore, by January 3, 2025, the Indemnitors shall (1) deposit cash or other collateral satisfactory to Westfield totaling $2,000,000 to protect Westfield from further liability resulting from the owner's termination of Legacy Construction's right to complete the bonded contract and/or to secure the Indemnitors' obligations to Westfield; and (2) furnish Westfield access to the Indemnitors' records so Westfield can assess and implement measures to mitigate its liability and enforce its rights against the Indemnitors.

**IT IS SO ORDERED,** this 12th day of December, 2024.

s/ Sheryl H. Lipman<br>
SHERYL H. LIPMAN<br>
CHIEF UNITED STATES DISTRICT JUDGE

---

[7] Given the lack of opposition from any Defendant other than the Bartozzis, the preliminary injunction's terms are applicable to every Defendant.  To the extent Legacy or the Herins have not provided their books consistent with the terms of the Indemnity Agreement, they are obligated to do so now.  Moreover, as noted above, the Indemnity Agreement and the Completion Agreement make it clear that the Indemnitors are jointly and severally liable for depositing collateral.  (See ECF No. 1-7 at PageID 36; ECF No. 1-9 at PageID 55.)